All right. Mr. Hall, delightful to see you, and good afternoon. And we're ready when you are. Well, thank you. Good afternoon, Judge Lane, Judge Schall, Judge Dyke. And I am one for Page Hall II here, representing the appellate NQ America Corporation. This appeal presents two issues. The first is, are all multifunction monitors precluded from classification as output units of automatic data processing machines by virtue of Chapter 84, Note 5e of the Harmonized Tariff Schedule of the United States, and by a single sentence in the explanatory note for Heading 8471 of the Harmonized Tariff Schedule. So the government pretty much admits you're right about that, doesn't it? Pardon? The government pretty much admits you're right about that. That is correct, Judge Dyke, yes. So they're saying, OK, but you've still got to establish principal use. Your survey wasn't good enough to do that. You lose anyway. Thank you, Your Honor. The second issue, as a matter of fact, happens to be. The answer is that the Court of International Trade erroneously decided that all multifunction monitors precluded from classification as output units of ADP machines is the monitor at issue, the Dell 2001FP, a multifunction monitor that is an output unit of an ADP machine. And regarding that, the first point I would like to make is, it's fairly easy to understand what we're talking about here. I was just up at the clerk's office on the fourth floor checking in a little while ago, and voila, right there on the desk was a Dell monitor. The monitor's an issue of the type commonly used as the output units for desktop computer systems. You likely have one in your own office, or you may have one at home with your desktop computer system. And in those systems, generally the tower is the thinking part. That's the ADP machine, has a central processing unit. Your keyboard and mouse are the input units of the system. The output unit of the system generally is the monitor. That's what you're looking at while you're inputting into the thinking part. As I understand your argument, your position is that the question is whether there's a principal function rather than a principal use at issue here. That's correct, your honor. And that the evidence would support the conclusion that the principal function of this warrants the outcome that you seek. But you seem to be arguing as if this was a principal use question. You seem to be arguing the same carborundum factors and arguing that, nonetheless, the evidence that's in the record supports the conclusion you seek. Well, thank you, Judge Lynn. What has happened traditionally over the 20 years of classifying multifunction monitors by customs, by US customs, is that they have applied, or so they say in the rulings, a principal function test under section 1603. But in doing so, they use the carborundum factors, which are normally used to determine class or kind for the purpose of a use test. But they apply those carborundum factors to multifunction monitors under a principal function analysis. The difference is there's really only a small difference. And I don't think it makes that much difference in this appeal. The only difference is principal use looks at the class or kind of merchandise. Principal function looks at the specific merchandise at issue. And I believe that the evidence that was before the undisputed evidence that was before the Court of International Trade in this particular case, and that's before this court right now, clearly leads to the classification of this monitored issue, the DEL 2001 FP, as an output unit on an automatic data processing machine. Did the Court of International Trade make a factual finding on the principal use or principal function question? That's a good question, Judge Lent. The Court of International Trade did address it, did address the evidence in a footnote, and noted the evidence that we had presented, user survey of the DEL 2001 FP. However, the Court of International Trade said, we really don't need to discuss this at length because we've decided all multifunction monitors are precluded from classification and handing it to a subpoena. Don't we have to send it back for fact-finding? Pardon, sir? Don't we have to send it back for fact-finding? I do not believe so, Judge Steich. I really don't. If you think about what we have here, as I just described it, and then you think about whether or not you and your family would at home watch the Super Bowl or Avatar or play Wii games on a monitor that's a 20-inch diagonal, that has no sound, no speakers, has no tuners so it doesn't get off the air signals or display signals, whether that could possibly be a video monitor. I think the Customs Service, now US Customs and Border Protection, has more or less been disingenuous by turning to General Note 3C and saying, yeah, we recognize it has computer monitor functions and video monitor functions, but we can't figure out which is the principal function. But these are quintessentially factual questions that we really can't address, unless you're arguing that this is so compelling that we would rule as a matter of law that the evidence supports this, which seems a little odd. Well, Judge Landrieu, really, I think that you can rule based on the facts that were before the Court of International Trade that were somewhat addressed by the Court of International Trade, but they're there. I think you can look at the monitor, the user's manual, and the quick setup guide, compare those to the criteria in the explanatory notes. Well, Mr. Hull, as both Judge Lynn and Judge Dyken said, we're getting into the factual record, and that's something that really the trial court has to do. We supposedly make a mistake, in your view or the government's view, in that kind of analysis. Then on rehearing, we get a petition saying, well, the finding of the panel is clearly erroneous. But that's something that we say about a trial court. I mean, I have to agree, it does seem that assuming you're correct, it has to go back, in fairness to both sides. I think, Judge Schall, if it went back with the proper instructions from this court, I still think it could be decided on cross motions for summary judgment. I don't see this case being remanded and a trial being necessary, again, because I think if you look at the explanatory notes, which is law, or at least instructive, and you look at the criteria therein for the two headings that issue, then you look at the carborundum factors, even though they usually go to class, or kind, or use customs as used in principal functions. I think that it's clear, by just looking at the monitor, like the one at the courtroom clerk's desk, or on your own desk, without going any farther, to decide that it's a computer monitor. It may be that the case could be determined on summary judgment at the Court of the National Trade, but wouldn't that court have to decide that in the first instance? Judge Shull, I think not. I mean, my feeling is that the Court of International Trade had those facts in front of it, addressed those facts, again, to a limited extent, and presented this case, or we present this appeal to this court, based on a more narrow interpretation of the law, which we think is clearly erroneous. You want us to take judicial notice of the fact that no one, in his or her right mind, would use this as a video monitor? That's pretty much my position, Judge Dyer, is that all you have to do is look at it. You don't have to look at the thousands of pages of exhibits that we in the government submitted. To me, it's obviousness. A couple of panels ago, you weren't here for that, Judge Shull. There were patent lawyers in there arguing something I don't understand, but they kept talking about obviousness. To me, this is obvious, Judge Dyer. That's what I'm really saying. And how customs could go 20 years and say, boy, we really cannot decide. This thing has no audio. It has a small picture. Its resolution, its pixel size, its vertical scanning is for long-term viewing at 12 inches away from the face of the user. How can it not be a computer monitor? That's my position, and my time is over. All right, very good. Let's hear from the other side. Ms. Williams? May it please the court, I'd like to address a couple of the points raised by Mr. Hall. First of all, he- Do you agree that the Kirby National Crime was wrong about 5E? Yes, the government does agree. And the WTO also disagrees with us and plaintiffs. I would like to point out, though, there is a huge difference between principal function and principal use. My opponent said, well, there's a small difference. It wouldn't have an impact here. It is a massive difference, and it is what this entire case is about. Principal function, while never actually been ruled on by a court, has been viewed to regard the actual import. Principal use is a term of art. It means a specific concept that has been litigated many, many times, which date to the carborundum factors. I would have thought that the simple answer to this is that they're trying to come under 8471, and if they're going to do that, they've got to have that provision in Note 5B says it's principal use. Exactly. And principal use, that is absolutely correct. And in order to principal- So why don't you lose on your principal use? Because they haven't met their burden of proof, which goes to the second point of why this case really doesn't need to be remanded. In principal use, the way that analysis works is you take your good, you figure out the class of goods with which it is similar or fungible, to quote from Primal Act. Then you look at the use of that class of goods with which it is fungible, and you say, what's the principal use of that class? In this case, the plaintiff introduced a tremendous amount of evidence, both for and against their position on what the use of its good is. It never said, what is the type of goods it's fungible with? And then once we, and the way you figure out the type of goods that it is fungible with is you have to compare the expectations of the consumer, how they're sold, how they're designed. So you can see, are these, the good- They put in evidence about that. I'm sorry. They put in evidence about that. No, they put in evidence about their good. There's not one bit of evidence about, here's the type of good with which it's fungible. And the kind of good, the evidence they put in about their good doesn't even show what they say it shows. The kind of evidence they put in about their good shows that their good does have a connection that permits video. It permits somebody to hook it up for gaming, like PSP, that sort of thing, which is not a computer. It can be mounted on a wall. It doesn't necessarily have to be placed on a desk near a computer. It has a wall mount. The sales evidence, such as at Joint Appendix 571.1, excuse me, 555, 957.1 to 958, tells you that this is good for videos, for gaming. It doesn't limit it to computer use. In addition, they rely very heavily on a survey, which you know from the record, the government introduced this data, a very highly qualified statistician who showed that survey is very, very flawed. You can't reach any conclusions about it. So in this case, we don't even know the principal function of the good. We don't know how it's actually used, much less the class or kind of good to which it belongs and the principal use of that class or kind. Ms. Williams, let me ask you this principal use versus principal function issue. At the bottom of page five of this reply brief, the, Ben Q says, the United States does not address Ben Q's position that when comparing the potential applicability of two competing headings, each of which is in a different chapter of the same section of the HTSUS, the section note prevails over a chapter note in only one of the two competing chapters. In the instant appeal, section 16, note three prevails over chapter 84, note five B, A, because only one of the competing headings is in chapter 84. What is your response to that? My response is, that's absurd. First of all, in this case, there's no conflict between the chapter note and the section note. They can be and should be read completely congruously. There's no problems. You're saying note three. Note three. And note five B. Absolutely, yes, they can be read completely together. They make sense together. There's no conflict with them whatsoever. The plaintiff would have us read note three to section 16 to conflict. There's no reason to do that, because note three, by its very language, says you're not supposed to. It says, unless context otherwise require. Here, the context does not otherwise require. So that's my response, is there's absolutely no reason to find that these two notes conflict. I would like to touch on why remand is not necessary. And the reason is, while the trial court did not reach this issue, there is no disputed facts. The government did not introduce contrary material facts. All we introduced was the expert, Dr. Bly, who said their survey was flawed. There's no actual dispute. So likely, if it were remanded, it would be decided on summary judgment and possibly be back up here on a legal issue, which is, the court has to know review of that legal issue. So essentially, it was harmless error not to reach this. Sorry. Well then, wouldn't it be appropriate, we were discussing this with Ms. Hall, wouldn't it be appropriate then to send it back, and if the Court of International Trade feels that the case can be decided on summary judgment, it can proceed to do so after hearing from the parties. That would be appropriate, but not necessary, because in this case, the plaintiff didn't meet their burden of proof on principal use. Well, there is evidence that they asserted on principal function that is relevant. They went through the same sort of carborundum factors and talking about the characteristics of the goods and the expectation of purchasers and the channels, class of kind in which the merchandise moves and all of that. They introduced evidence on the principal function. That is not the test. It is the principal use, which while the terms, it's not the same. That is what is extremely important in this case. But even if it's not the same, and there was evidence there that is at least relevant to some extent on principal use, so. What their evidence is relevant to is half of the equation for analyzing principal use. They introduced evidence regarding the use of their imported good. They forgot half the equation, which is the evidence regarding the use of the class or kind to which it belongs. And I'll give you an analogy, which is typically thrown around. If you have a very expensive race car, you bring it into the country, and all you want to do is put it like a statue. You're trying to import that as a statue. In that case, the analysis is, is this car a statue or a car? That's gonna be our test here. And car, let's assume car is a principal use provision. You wouldn't look at just the car. How is it being used? Is it being used as a statue? Of course they would. That's not how you do it. You say, what is the type of product with which it is fungible? And here it would be cars. What is the principal use of cars to drive down the street? Okay, this statue car belongs to the class that is used as cars. Therefore, that's how it's classified. In this case, all they did is introduce evidence that this product is used as a statue. I'm just using this as an analogy. They forgot to produce the second half of the requirement, which is how is the class or kind used? And then you compare them.  between the use and the function than in your racing car statue. Maybe, that's the point is we don't know. There's no evidence on it. They didn't introduce. For all we know, every flat panel is exactly like the one that's important. For all we know, every flat panel that's used as a video monitor has the same things. And remember, this is 2004. This is not now. Looking at this good in the eyes of six, seven years later is not fair because electronics changed so much. We have no idea what happened in 2004. What is the physical description of every monitor that came in then? We don't know. There is no evidence on it. And that's the critical thing here is they've introduced 50% of the evidence they need. And when you only introduce 50%, you have to live and die by what you do as a child court. But maybe they would fail on remand. But the question is whether it's proper for us to make that determination or whether we should leave it to the Court of International Trade to look at these facts and come to the conclusion that you desire. We believe since they've failed their burden of proof, it is a legal issue which this court could decide because it's simply a legal issue. There's not a weighing of facts. That is why we feel it's proper. But again, alternatively, it should go back. The plaintiff could never win under principle use at this stage because the facts, at worst, show that the court didn't decide it. If there's any other questions, I will sit down. Thank you very much. Thank you. Never penalize for relinquishing time. Oh, thank you. Mr. Hall. Thank you, Judge Linn. And I'll be brief as well. Going to Judge Dyke's question to Ms. Williams, and let's just assume for a moment that we are stuck with legal note 5B, little a, of Chapter 84, Harmonized Terror Schedule of the United States. Section 1603 did not exist, and we didn't get into the situation which was well-described by Judge Schall. So we're stuck with principle use. OK, what's the class or kind, Paige? That's what I would ask you. What's the class or kind if I'm stuck in that little box? The class or kind, usually the government goes for the most expansive thing, and I think this is right. And we go for the narrowest thing because you have less facts to prove. Well, here, the most expansive thing I can think of as a class or kind is multifunction monitors. The next category that I think would be appropriate would be multifunction monitors that are principally used as output units of automatic data processing machines. Because we don't care about other monitors. So does this unit, again, using the obviousness test that Judge Dyke alluded to when I was speaking earlier, is this monitor of the class or kind of monitor that's principally used with an automatic data processing machine? Is it the type that you have on your desk in your office, and maybe you have a desktop computer at home, and this is your output unit, your primary output unit? Or is it something you're going to invite your friends over to your house to listen with no sound and watch on a 20-inch diagonal monitor with close-in resolution the Super Bowl? Or play a Wii game with no sound on this monitor? Or the class or kind of monitor, are you going to bring your family into the family room and watch Avatar with no sound on a small screen with the resolution that's best close to your face? What significance, if any, is the fact that these monitors have multiple inputs for including inputs that typically would come from a television? Judge Lamb, what that does is it takes us out of a slam dunk we win. The slam dunk we win is if you could only hook it up. I thought you meant to say something like that. Well, if you could only hook it up to an ADP machine, if it were only an output unit for an ADP machine, then it's obviously a heading 8471 HDSUS. So is it the fact that there are these multiple inputs at least relevant to what kind of class or kind of merchandise we're talking about? That's correct, Judge Lamb. So here is one yellow, if you look on the back of your computer monitor, one yellow video composite connector for an RCA cable. No red, white, left, right, which you probably have on your computer monitor now. And an S-video, which I don't think anybody uses S-video cables anymore. That's it. We're talking about these little inputs on here, which to me, without the sound coming in and without speakers on a small screen like this, it has to be a lateral subsidiary aberrational use to principally use this. And going back to the harmonized tariff schedule definition of principal use, it used to be under the old TSUS 51% of every use. Now under the harmonized tariff schedule, it's that use that is more frequent than any other use. Line up all the other potential uses, and it could be 20% if everything else is 19 or below. And I gotta think, again, obvious this test. This monitor, an issue in this case, the Dell 2001FP, is obviously an output unit for an automatic data processing machine. Whether you use principal function or principal use, class or kind is output units for automatic data processing machines. This is there. It's not what you watch Avatar on. Sarah, just one thing. Yes, sir. Why shouldn't we look at the note for 8471, if that's the section or the chapter that you say that you should be under? I mean, why don't you have to satisfy the principal use test under note five, as opposed to the function test? The reason, Judge Steik, is because note five is in chapter 84, which is where 8471 is. The competing provision is 8528, heading 8528, which is in chapter 85. Yeah, but just to come under 8471 itself, you've gotta satisfy note five, right? Again, Judge Steik, if that's where we are, I think we do anyway. I sincerely think we do, based on the look-see test. All you gotta do is look at this monitor. And if you go the further step of looking at the user's manual, the quick setup guide, that's as far as anyone, as customs needed to go back in 2004. All right, thank you very much. Thank you, counsel, case is submitted. That concludes our session.